IN RE Netshoes Securities Litigation, Plaintiff,

against
XXX, Defendant. 

157435/2018

Plaintiffs: 
Scott & Scott LLC
230 Park Avenue, 17th Fl.
New York NY 10169
Defendants: 
Skadden Arps Slate Meagher & Flom LLP  for defendants Netshoes (Cayman) Limited, Marcio Kumruian, Francisco Alvarez-Demalde, Nilesh Lakhami and Donald Puglisi
4 Times Square
New York NY 10036
Sullivan & Cromwell — for defendants Goldman Sachs & Co., LLC, JP Morgan Securities, LLC, Banco Bardesco BBI S.A., Allen & Company LLC and Jeffries LLC
125 Broad Street
New York NY 10004


Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 004) 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108 were read on this motion to/forDISMISS.
Upon the foregoing documents and for the reasons set forth below, the defendants' joint motion to dismiss the Second Amended Complaint (the SAC) pursuant to CPLR §§ 3211(a)(1), (a)(5), (a)(7) and CPLR § 3016(b) with prejudice is denied.
THE RELEVANT FACTS AND CIRCUMSTANCES
The facts underlying this securities class action, brought pursuant to Sections 11, 12(a)(2) and 15(a) of the Securities Act of 1933 (the 1933 Act), are set forth in full in the court's prior decision (Netshoes I) on the first motion to dismiss (Mtn. Seq. No. 002) in this matter, and familiarity with same is presumed (NYSCEF Doc. No. 79). Briefly, the plaintiff brings claims in connection with the allegedly false and misleading Prospectus issued in connection with the April 12, 2017 initial public offering (the IPO) of Netshoes (Cayman) Limited (Netshoes), a Brazilian-based online retailer.
In Netshoes I, the court dismissed the action with leave to replead, finding that the plaintiff's pleadings (the Prior Complaint) failed to state a claim under Sections 11 and 12(a)(2) of the 1933 Act, that Netshoes did not violate Item 303 (hereinafter defined), and that, accordingly, there could be no Section 15 liability for Netshoes' individual officers and directors (NYSCEF Doc. No. 79) because, among other things, the Prior Complaint's allegations that Netshoes must have had an undisclosed returns policy lacked any factual basis other than that subsequent to the IPO, Netshoes took a significant write-down. This hindsight analysis, the court held, was insufficient to support the notion that the offering documents were false and misleading by misstating revenue, accounts receivable or a violation of IAS Accounting Rule 18 (IAS 18) (id. at 8-19).
Now, in its SAC, in addition to the allegations previously set forth, the plaintiff also asserts that, unbeknownst to investors, Netshoes had, in fact, negotiated rights of return on its supposed sales with B2B (hereinafter defined) customers such that the "sales" were wholly contingent on the customers' resale of the goods to end-user consumers (e.g., SAC, ¶ 10). In other words, the plaintiff claims that the statements in the offering documents were misleading when made because the entire financial analysis and projection was based on a known error — i.e., a misstatement of revenue and accounts receivable. The plaintiff alleges that such revenue recognition was improper under IAS 18 because (i) the risk of loss never transfers to the buyer and (ii) it is not probable that the economic benefits of the sale will flow to the seller (SAC, ¶ 11-12). Accordingly, and for this reason, the SAC alleges that Netshoes' representation in its Registration Statement that its 2016 Financial Statements, which were included therein, were prepared in accordance with the International Financial Reporting Standards (IFRS) was also materially false and misleading (id., ¶ 13). 
The SAC alleges that Netshoes was aware of these rights of return at the time of its IPO because it negotiated them directly with its distributor Midway's Brazilian B2B Customers (id., ¶ 14). This is not a mere conclusory allegation or based primarily on the hindsight write-down as it was in the Prior Complaint, where the plaintiff merely alleged that there must have been a returns policy, now, the plaintiff alleges that there was a returns policy in place relying on the sworn declaration of Midway's Chief Executive Officer Wilton Bastos Colle filed in a Florida proceeding commenced in 2018 by NS2.com Internet S.A. (NS2), a Netshoes subsidiary, against Midway and Mr. Colle (the Florida Action; SAC, Ex. 3) in which Mr. Colle attests that representatives of Netshoes directly negotiated "special terms such as deferred payment and the right to return any product that did not sell in a timely manner" with B2B customers during a [*2]Midway-sponsored client even in Miami in October of 2016 (id.). Mr. Colle further attests that these "special terms" were granted in return for the clients' agreement to take increased deliveries of Midway products from Netshoes (id.; SAC, Ex. 2, ¶ 22). The Florida Action is currently still pending.
The SAC further alleges that beginning in March 2016, Netshoes demanded that Midway ramp-up production, and committed to purchase all of the product Midway's manufacturers could produce, but then halted production before the manufacturers completed the orders, leaving it with an unbalanced product inventory (id., ¶ 44). Then, in October 2016, Netshoes allegedly told its B2B customers that it was looking to dramatically increase sales of Midway products (id., ¶ 45). However, because Netshoes' existing product inventory remained unbalanced, the B2B customers allegedly insisted on, and Netshoes allegedly agreed, as discussed above, to the special terms such as deferred payments and the right to return any product that did not sell in a timely manner (id.). 
Later, Netshoes also allegedly agreed to provide clients with substitute products to complete their inventories, but when Midway had substitute products actually available to ship in early 2017, Netshoes allegedly refused to take delivery because it did not want to have the liability for the $8 million letter of credit necessary to accept delivery of the products on its books and records (id., ¶ 47). The plaintiff claims this decision left Netshoes' B2B customers with unbalanced and difficult-to-sell inventories of B2B product at the time of the IPO that could be returned to Netshoes if they remained unsold (id.; cf. Novak v Kasaks, 216 F3d 300 [2000]). Hence, the risk of loss never passed and the revenue was not as it was stated in the offering documents.
The plaintiff further alleges that the Prospectus offered a deceptively positive description of Netshoes' then-new business-to-business supplements and vitamins distribution business (the B2B Business) that misled investors to believe that Netshoes was well-positioned for growth and improved profitability based, in part, on this purportedly burgeoning business segment. According to the plaintiff, the Prospectus stated that the B2B Business (i) provided Netshoes with an additional source of revenue that allowed Netshoes to drive incremental sales, (ii) was designed to assist the company in "generating" positive cash flow and reduce its historic reliance on bank financing and capital raising by delivering increased net sales at higher margins while taking advantage of Netshoes' existing infrastructure, and (iii) would "play a key role" in its long term growth strategy and improve its operating cash flows (SAC, ¶ 54).
The SAC further alleges that the Prospectus boasted that in its first year of operation, the B2B Business had distributed Midway-brand nutrition products and supplements "to over 105 drugstores and supermarkets in Brazil," generating net sales of R$74.8 million, and that this revenue accounted for 4.3% of total net sales for 2016, helping to boost gross margins, which the Prospectus touted had exceeded 30% for the three years preceding the Offering (id, ¶ 55; Prospectus at 55, 83). In reality, however, the plaintiff alleges that these statements were at odds with the actual state of the B2B Business at the time of the IPO. Significantly, the SAC alleges that "[b]y the time of the IPO on April 12, 2017, [] R$82.4 million of the R$90.5 million in reported B2B revenue since the business had been in operation — more than 90% of the total — remained uncollected" (SAC, ¶ 16 [emphasis in original], citing Netshoes (Cayman) Ltd., Report of Foreign Private Issuer [Form 6-K] at 27 [May 15, 2017 Quarterly Report]; SAC, ¶¶ 49-50).
Because this information about Netshoes' returns policy and unsold inventory was all [*3]"known, or knowable" to the defendants at the time of IPO, the plaintiff claims it "rendered the statements about the B2B Business in the Prospectus, including its financial results, materially false and misleading" (NYSCEF Doc. No. 103 at 6).
DISCUSSION
I. Heightened Pleading Standard Does Not Apply
As they did in Netshoes I, the defendants again argue that the heightened pleading standard of CPLR § 3016(b) applies to the claims asserted in this action because the plaintiff claims that the offering documents contain misrepresentations and are therefore materially false and misleading.
Inasmuch as CPLR § 3016(b) provides that "[w]here a cause of action or defense is based upon misrepresentation, fraud, mistake, wilful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail," the defendants argue that dismissal is required where the plaintiff s fails to set forth their claim with the requisite particularity. The argument fails.
As the United States Supreme Court explained in Cyan, Inc. v Beaver County Empl. Retirement Fund, Congress enacted the 1933 Act and the Securities and Exchange Act of 1934 (the 1934 Act) to promote honest business practices in the securities market (138 S Ct 1061 [2018]). The 1933 Act created private rights of action in connection with the initial public offerings of securities and the 1934 Act regulates subsequent trading activity. Federal and state courts have concurrent jurisdiction over claims that are based on alleged violations of the 1933 Act and federal courts have exclusive jurisdiction over claims that are based on alleged violations of the 1934 Act. In Omnicare, Inc. v Laborers Dist. Council Const. Indus., the Court explained that the 1933 Act "protects investors by ensuring that companies issuing securities make a full and fair disclosure of information relevant to a public offering" (135 S Ct 1318, 1323 [2015]).
The plaintiff's claims in this case are based on alleged violations of the 1933 Act. In interpreting this federal statute, the Second Circuit in Litwin v Blackstone (634 F3d 706, 715 [2d Cir 2011] held that claims based on violations of Sections 11 and 12(a) of the 1933 Act need not satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.[FN1]
In so doing, the Litwin court, and quoting Rombach v Chang (355 F3d 164, 171 [2d Cir 2004]), a mixed claims case (i.e., a case involving claims based on alleged violations of both the 1933 Act and the 1934 Act), explained:
Fraud is not an element or a requisite to a claim under Section 11 or Section 12(a)(2). [A] plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2). 
In addition, in NECA-IBEW Health & Welfare Fund v Goldman Sachs & Co., 693 F3d 145 (2d Cir 2012), the Second Circuit further explained:
Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims [*4]which —unless they are premised on allegations of fraud—need not satisfy the heightened particularity requirements of Rule 9(b). 8 Panther Partners Inc. v Ikanos Comm., Inc., 681 F3d 114, 120 (2d Cir 2012). Nor do the heightened pleading standards of the Private Securities Litigation Reform Act apply to such non-fraud claims. See 15 USC § 78u— 4(b)(1)—(2). Thus, the provisions " 'place[ ] a relatively minimal burden on a plaintiff.'" Litwin v Blackstone Grp., L.P., 634 F3d 706, 716 (2d Cir.), cert. denied, 132 S Ct 242 (2011) (quoting Herman & MacLean v Huddleston, 459 US 375, 381—82, [1983]); see also id. at 715 (observing that §§ 11 and 12[a][2] claims not premised on allegations of fraud are "ordinary notice pleading case[s], subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8[a]"); In re Morgan Stanley Info. Fund, 592 F3d at 359, 360 (observing that §§ 11 and 12[a][2] "apply more narrowly but give rise to liability more readily" than § 10[b] of the Securities Exchange Act of 1934, 15 USC § 77 j[b])
(693 F3d 145 [2012]).
Accordingly, the Second Circuit has held that under the 1933 Act, Section 11 and (12)(a) claims sound in negligence even as to an alleged "misrepresentation" of fact where the duty is prescribed by the statute, causation is established if the securities were purchased in connection with or traceable to the offering documents at issue and damages are as provided for in the 1933 Act. For the avoidance of doubt, because the Second Circuit is interpreting the express terms of the 1933 Act, these holdings do not create or implicate any issue of federal common law under Erie v Tompkins, 304 US 64 (1938). 
CPLR § 3016(b) does not apply to negligence actions, and the court should not re-characterize the nature of a federal statutory action (whether or not the pleadings allege knowledge or intent). At bottom, this remains a negligence action, and it does not matter whether plaintiffs often allege knowledge and intent either to support parallel claims under the 1934 Act (which does require scienter and which, under those circumstances, must meet the heightened pleading requirements of Federal Rule 9[b]), or to make clear to the court and defendants that particular 1933 Act claims may be particularly strong. Indeed, the Litwin court indicated that Section 11 and 12(a)(2) claims are subject to Rule 9(b) only insofar as they are premised on fraud.
As the court (Kaplan, J.) in In re AmTrust Financial Services, Inc. Sec. Litig, 2019 WL 4257110 (SDNY Sept 9, 2019) recently explained with respect to claims brought based on violations of both the 1933 Act and the 1934 Act: 
To state a claim under Sections 11 and 12(a)(2), the plaintiff must allege that the registration statement or prospectus contained: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." If a plaintiff establishes one of these three things, then "the general rule is that an issuer's liability is absolute." This general rule is subject to exception, of course.
The exception applies when the Section 11 and 12(a)(2) claims are "premised on allegations of fraud." In these circumstances, a plaintiff must meet the additional pleading requirements of Rule 9(b). This is so because Rule 9(b) "applies to all averments of fraud." And even though fraud is "not an element or a requisite to a claim under Section 11 or Section 12(a)(2) ... claims under those sections may be — and often are — [*5]predicated on fraud." Accordingly, when the same course of conduct supports both a claim of fraud under the [1934 Act] and a claim under Section 11 or 12(a)(2) of the [1933 Act], the latter claim must satisfy the requirements of Rule 9(b) unless the complaint identifies clearly an alternate basis, i.e., negligence, for the claim. Mere disavowal of any allegations that would make Rule 9(b) applicable will not suffice.
(2019 WL 4257110 at * 11).
Put another way, when the claim arises under both the 1933 Act and the 1934 Act and where fraud is alleged, as it must be under the 1934 Act, the pleadings must comply with the heightened pleading requirement of Federal Rule 9(b). This reading of the pleading standard appears consistent with the 1933 Act, which only relates to the initial issuance of securities, and applies a lower negligence standard so as to encourage underwriters to do better due diligence (for which they face strict liability) — as opposed to secondary market transactions where fraud standards, along with their higher pleading standards, apply. Accordingly, CPLR § 3016(b) need not be applied to state court 1933 Act claims that are not paired with a securities fraud claim under the 1934 Act (which they cannot be as state courts do not have concurrent jurisdiction as to claims based on violations of the 1934 Act).
In addition, not requiring a higher pleading standard is consistent with New York law. On a motion to dismiss in New York state court, the court's inquiry is whether the alleged facts fit within any cognizable legal theory (Leon v Martinez, 84 NY2d 83, 87-88 [1994]). Inasmuch as a cause of action based on negligence is sufficient for purposes of claims under Section 11 and 12(a)(2), a CPLR § 3211 analysis should not therefore require CPLR § 3016(b) pleading with particularity to survive a motion to dismiss.
Moreover, if the court were to apply a heightened pleading standard of CPLR § 3016(b), there would be a disparity in pleading standards with respect to a federal statute that creates concurrent state court jurisdiction based on whether the claim is brought at 60 or at 40 Centre Street (i.e., in state or in federal court). There simply is no evidence that Congress intended this disparity, which undoubtedly would create forum shopping. 
Finally, the court acknowledges that recently in Hoffman v AT & T Inc. (2020 NY Slip Op 50517[U]) and in Matter of Sundial Growers Inc. Sec. Litig. (2020 NY Slip Op 50579 [U]), the court (Ostrager, J.) applied CPLR § 3016(b) to the claims asserted in those cases. 
In Hoffman, the court wrote:
The first issue the Court must address is whether plaintiff's claims are subject to the notice pleading standard under CPLR §3013, as plaintiff argues, or the heightened pleading standard under CPLR §3016(b), as defendants argue. CPLR §3016(b) states:"[w]here a cause of action or defense is based upon misrepresentation, fraud, mistake, wilful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail" (emphasis added). Here, plaintiff alleges that the Offering Documents contain misrepresentations. See e.g. FAC ¶ 15 ¶ 64 ¶80 -81 ¶90 -91. Accordingly, CPLR §3016(b) applies and plaintiffs must state the circumstances constituting the misrepresentations in detail.
(2020 NY Slip Op 50517[U] [emphasis added])
Notwithstanding the foregoing, the court in Hoffman held that, "even if the notice pleading standard under CPLR § 3013 applied, the action must still be dismissed" based on the [*6]documentary evidence that was submitted which the court held utterly refuted the plaintiff's claims (id.).
In Sundial Growers, the court wrote:
[h]ere, plaintiff alleges that the Offering Documents are materially false and misleading, in other words, they contain misrepresentations. Accordingly, CPLR § 3016(b) applies and plaintiff must state the circumstances constituting the misrepresentations in detail.
(2020 NY Slip Op 50579 [U] [emphasis added]). 
In that case, the court denied the motion to dismiss and held that the plaintiff had stated all three of its causes of action in sufficient detail to meet the pleading requirements of CPLR § 3016(b) (id.).
For the reasons set forth above and discussed below, here, the SAC sets forth considerable detail that was not present in the Prior Complaint, which detail might satisfy the requirements of CPLR § 3016(b), to the extent it applied in this case. In any event, for the reasons set forth above, to the extent that Hoffman and Matter of Sundial Growers Inc. Sec. Litig. could be read to conflict with the holding set forth herein, this court respectfully disagrees with the analysis in those cases because, this is an ordinary notice pleading case and CPLR § 3016(b) does not apply (Litwin, supra).
II. The SAC States a Claim under Sections 11 and 12(a)(2) of the 1933 Act
A. Motion to Dismiss Standard
On a second motion to dismiss, the "amended complaint must [] be analyzed as [] any complaint on a CPLR § 3211 motion; we construe the complaint liberally, accepting as true the facts alleged, and according plaintiff the benefit of every possible inference" (Plaza PH2001 LLC v Plaza Residential Owner LP, 98 AD3d 89, 99 [1st Dept 2012]).
B. The SAC Sufficiently Alleges a Materially False or Misleading Contemporaneous Statement
As the court explained in Netshoes I, accurate statements about past performance are not actionable under the securities laws (NYSCEF Doc. No. 79 at 8). Likewise, statements of puffery or corporate optimism are not actionable under the 1933 Act (Rudman v CHC Grp. Ltd, 217 F Supp 3d 718, 728 [SD NY 2016] [statements regarding issuer's "strong" relationships with customers are "no more than 'puffery'"]). Rather, to be actionable, statements of general corporate optimism must be "worded as guarantees or [be] supported by specific statements of fact" or concrete allegations showing [that] the speaker does not genuinely or reasonably believe them" (Ong v Chipotle Mexican Grill, Inc., 294 F Supp 3d 199, 232 [SD NY 2018] [emphasis added]). 
Here, unlike in the Prior Complaint, the SAC does not merely allege statements about future growth that must have been untrue based on subsequent results; the SAC alleges specific contemporaneous facts that, if true, show that Netshoes had reason to know that the financial information contained in the Prospectus about its B2B Business was materially false and misleading and that the speaker did not genuinely or reasonably believe it. These are not just allegations of "fraud by hindsight." 
Inasmuch as the defendants argue that the court should not consider the allegations based [*7]on Mr. Colle's affidavit because he is an adverse party in an as-yet pending lawsuit, which NS2 has denied, citing In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig. (218 FRD 76, 78-79 [SD NY 2003]), the court disagrees with the defendants' characterization of the applicable evidentiary standard at this stage of the proceeding. As an initial matter, although some district courts within the Second Circuit have taken the position that a complaint may not reference allegations from a separate proceeding that has not been decided on the merits, such as the court in In re Merrill Lynch on whose holding the defendants' base their argument (id.), the Second Circuit has not actually articulated any precedent for such a broad rule, and other courts in the circuit have taken a wholly contrary view (e.g., In re OSG Sec. Litig., 12 F Supp 3d 619, 621-22 [SD NY 2014] ["while allegations from another law suit are not evidence and cannot be 'introduced in a latter trial for collateral estoppel purposes, plaintiffs need not provide admissible proof" at the pleading stage]). In any event, neither authority (i.e., In re Merrill Lynch nor In re OSG) is binding on this court. 
Rather, applying the standard applicable to CPLR § 3211 motions to dismiss, and taking the facts alleged in the complaint as true (i.e., that Netshoes was aware in 2016 that customers were not paying or required to pay for Midway products [SAC, ¶ 48]), the court finds that at this juncture the plaintiff's allegations and as corroborated both by Mr. Colle's affidavit, sworn under penalty of perjury, and the subsequent financial performance (i.e., the write-downs) are sufficient to provide a basis of facts on which the claims in the SAC are founded (cf. Denny v Barber, 576 F2d 465, 470 [2d Cir 1978]). 
By recognizing B2B "sales" as revenue when Netshoes knew or should have known that its products could have been returned and that, critically, the risk and rewards of ownership had notbeen transferred, and by failing to recognize the liability for these future returns, Netshoes may well-have violated IAS 18. Put another way, if the allegations in the SAC complaint are true, this is not a mere judgment with respect to which reasonable minds might differ. Rather, the failure to apply the accounting rules to which Netshoes claimed to adhere "raises issues of objective fact that [is] not protected as [an] opinion statement[]" (Fresno Cty. Employees' Retirement Assn. v comScore, Inc., 268 F Supp 3d 526, 546 [SD NY 2017]; see also Underland v Alter, 2011 WL 4017908, at *9 [ED PA Sept. 9, 2011]).
Even if the alleged accounting misstatements are viewed as opinions, they may nonetheless be actionable if they did not "fairly align[] with the information in the issuer's possession at the time" (Tongue v Sanofi, 816 F 3d 199, 210 [2d Cir 2016]). Taking the allegations in the SAC as true, the plaintiff has sufficiently alleged that Netshoes' statements concerning B2B revenue and its compliance with IAS 18 were not honestly held based on, among other things, Netshoes' awareness that the "revenue" was not revenue and that which was characterized as B2B receivables were not true receivables given the alleged right of return of the B2B products. 
As the Supreme Court made clear in Omnicare, supra, 1933 Act liability may be imposed not only where the speaker does not "hold the belief she professed" or the "supporting facts she supplied were untrue," but also where an opinion is expressed in the offering documents that  though sincerely held and technically true  omits information in a way that makes the statement misleading to a reasonable investor (135 S Ct at 1327, 1332).
To be clear, these allegations are materially different from what was alleged in the Prior Complaint because the write-down of which the plaintiff complains occurred subsequent to the IPO and could not, without more, make Netshoes' prior financial statements actionable based on [*8]hindsight. However, now, with a factual basis for its allegations, the SAC alleges that the financial statements were not true when made(i.e., as opposed to, they must have been untrue when made, as previously alleged).
Nor can the fact that Netshoes' auditor KPMG signed off on the financial statements in the offering documents (Prospectus at 151, F-3) and at no time concluded that a restatement was required serve as basis, on its own, to find that no misstatement in the financial documents was made. By making this argument, the defendants misapprehend the significance of any restatement in this scenario. To wit, the reissuance of financials may be a sword, but it is not a shield. Where they have been reissued, it may signify evidence of a problem. However, the fact that they have not been reissued does not ipso facto mean that they were proper.
Finally, and for the avoidance of doubt, to the extent that the defendants argue that even if there was an undisclosed returns policy, the risk of loss was on Midway and therefore dismissal is required, this misses the point. The issue is not Midway's revenue (see Ptf. Opp. at 9, n 14, NYSCEF Doc. No. 103). The issue is whether Netshoes presentation of its revenue, which included the B2B's revenue, and the financial projections, which were based on such revenue, were materially misleading as contained in the offering documents.
C. The Bespeaks Caution Doctrine Does Not Shield the Defendants Here
Although the bespeaks caution doctrine protects forward looking statements that are based on accurate present statements of fact, the doctrine has no applicability to forward looking statements based on misleading factual predicates. Here, the plaintiff alleges that the projected revenue, the increased margins and the improved cash flow that Netshoes projected for B2B products were based on an improper factual predicate (i.e., a revenue figure and accounts receivable figure that was not in fact revenue because the risk of loss had not transferred), and this is simply is not protected by the bespeaks caution doctrine. Put another way, these forward looking statements were misleading at the moment that they were made and did not actually depend on any future events (In re Vivendi Univ., S.A. Sec. Litig., 765 F Supp 2d 512, 569 [SD NY 2011] [35% EBITDA growth projection not protected because defendants did not disclose that it was predicated on a one-time purchase accounting benefit]) and here, according to the plaintiff, the defendants cannot rely on the bespeaks caution doctrine as their predicate was false. Under these circumstances, the doctrine does not shield the defendants from liability.
D. The SAC Sufficiently Alleges an Actionable Omission
Based on the new facts alleged in the SAC, without question, Netshoes' omission of information with respect to its B2B business revenue and returns policy was sufficiently material to any reasonable investor so as to survive a motion to dismiss (In re CitiGroup, Inc. Bond Litig., 723 F Supp 2d 568, 588 [SD NY 2010] ["complaint may not be properly dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance"]). And, as discussed, supra, the omission of information concerning Netshoes' returns policy was sufficiently important to its revenue claims to render those claims and accompanying financials misleading.
For the avoidance of doubt, the defendants argue that the B2B Business represented only 4.3% of the overall revenue of Netshoes and that therefore any misstatement was immaterial. This misses the point. This was an IPO where the B2B business as an unproven business was [*9]promoted as a growth vehicle, which is alleged to have included a significant known factual error as it related to revenue where the company was losing money. The revenue figures are the sine qua non of what investors are interested in when they make this type of investment. Under the circumstances, this was unquestionably material (see Litwin, supra, 634 F 3d at 717; Ganino v Citizens Util. Co., 228 F 3d 154 [2d Cir 2000] [courts must apply botha qualitative and quantitative analysis because although use of percentage as numerical threshold may provide basis for preliminary assumption that a smaller deviation is unlikely to be material, quantifying magnitude of misstatement in percentage terms cannot substitute for full analysis of all relevant considerations). 
E. Item 303
As previously discussed, "Item 303 imposes specific disclosure requirements on companies filing reports on SEC Forms 10-K and 10-Q" (NYSCEF Doc. No. 79 at 18). To be material and require disclosure, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as significantly altering the total mix of information available (id., citing Litwin, supra, 634 F 3d at 717). Based on the newly alleged facts in the SAC, the plaintiff sufficiently alleges that Netshoes should have disclosed the adverse trends it was experiencing in its B2B Business pursuant to Item 303 (17 CFR § 229.303[a][3][ii]), as they were or should have been known to management and reasonably likely to cause a material negative impact on Netshoes' business in that this allegedly motivated the undisclosed returns policy and for all the other reasons set forth above. Inasmuch as the defendants' argue that they technically complied with all their disclosure requirements because they were not required to disclose their most recent financials until May of 2017 and the IPO took place in April of that year, they cannot escape liability at this stage of the proceedings on a technicality (In re Facebook, Inc. IPO Sec. and Deriv. Litig., 986 F Supp 2d 487, 513 [SD NY 2013] [although company has "no general 'obligation to disclose the results of a quarter in progress' 'intra-quarter updates may be required [] if intervening events trigger a duty to disclose'"). Disclosure under Item 303 must be "accurate and complete as of the time [that the] Registration Statement became effective," and the defendants' duty thereunder became effective beforeit became effective because Netshoes was or should have been aware of the negative impact its returns policy on its B2B Business revenue (id.)
F. The Allegations with Respect to Loss Causation Do Not Require Dismissal
To the extent that the defendants assert that the plaintiff fails to state a claim because the absence of loss causation is apparent on the face of the SAC, loss causation is not an element of a Section 11 or Section 12 claim and the defendants have not met their burden of demonstrating that something other than their alleged omissions or misstatements caused the plaintiff's loss (id. at 523 [noting the high burden of this affirmative defense on motion to dismiss]). The court declines to dismiss the well-pled SAC on this basis.
III. The SAC is Not Untimely
The defendants also argue, in the alternative, that the plaintiff's claim must be dismissed as untimely because Section 11 and 12(a)(2) claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been [*10]made by the exercise of reasonable diligence" (15 USC § 77m). More specifically, the defendants assert that this one year statute of limitations period began to run almost immediately after the IPO with the release of Netshoes' IQ2017 results (the Quarterly Results) on May 15, 2017 because the Quarterly Results disclosed an increase in Netshoes' firm-wide past due receivables. However, whether this single disclosure, without more, was sufficient to give the plaintiff notice of its claims, particularly as the disclosure was silent as to the cause the reported change, cannot be determined on the current record (Newman v Warnaco Grp., Inc., 335 F 3d 187 [2d Cir 2003] [disclosure of restated earnings did not start limitations period as it did not disclose the inventory problems that formed basis of complaint]). 
IV. Section 15 Liability for the Individual Officers and Directors Cannot be Dismissed as Moot as the SAC States a Claim Under Sections 11 and 12(a)(2) of the 1933 Act
The court previously dismissed the Section 15 claim based on the plaintiff's failure, on the Prior Complaint, to adequately allege Section 11 or 12(a)(2) claims. To state a claim under Section 15 of the 1933 Act, a plaintiff must allege (i) a primary violation by a controlled person and (ii) control by the defendant of the primary violator (In re Refco, 503 F Supp 2d 611, 637 [SD NY 2007]). Here, the plaintiffs allege that, among other things, the individual defendants reviewed, contributed to and signed the offering documents (SAC, ¶¶ 25-33) and the individual defendants were controlling persons within the meaning of Section 15 of the 1933 Act by reason of their senior management positions and/or the directorships held at Netshoes and that they had the power to influence and cause Netshoes to engage in the conduct alleged in the SAC (SAC, ¶¶ 102-105). This is sufficient at this stage of the pleadings.
Accordingly, based on the foregoing, it is
ORDERED that the motion to dismiss is denied and the defendants are directed to file an answer to the second amended complaint within 30 days of this decision and order, and it is further
ORDERED that the parties appear for a preliminary conference on July 15, 2020 at 11:30 am.
DATE 6/2/2020
ANDREW BORROK, J.S.C.
Footnotes

Footnote 1:It should be noted that Sections 11 and 12 do not use the term fraud or misrepresentation. Rather, they focus on material misstatements or omissions of fact as one of the elements of the cause of action. Also missing is any mention of the scienter or causation elements normally specified in a fraud or intentional misrepresentation action.